W. A. Bruce and L. H. Bruce, Individually and as Partners, d/b/a Oak Park Food Service, and Freezo Center Corporation, an Illinois Corporation, Plaintiffs-Appellees, v. Leonard A. Ferrara, Individually and d/b/a Mid-America Food Service, Inc., Mid-America Food Service, a Corporation, Mary Eggert, Illinois Bell Telephone Company, a Corporation, and The Reuben H. Donnelly Corporation, a Corporation, Defendants-Appellants.

Gen. No. 52,666.

First District, Fourth Division.

March 19, 1969.

Frankenstein, Lewis & Feierberg, of Chicago (Paul A. Gold, of counsel), for appellants, Leonard A. Ferrara, Mid-America Food Service, Inc., and Mary Eggert.

Sidley, Austin, Burgess & Smith, of Chicago, for appellants, Illinois Bell Telephone Company and The Reuben H. Donnelley Corporation.

Groble & Groble, of Chicago (Raymond H. Groble, Jr., of counsel), for appellees.

MR. JUSTICE McCORMICK delivered the opinion of the court.

This appeal is taken from a permanent injunction entered in the Circuit Court of Cook County enjoining the defendants and their employees from making use of plaintiffs' customer lists or soliciting plaintiffs' customers for the purpose of selling them frozen foods or a membership in a frozen food plan. The court also ordered that an accounting be made by the defendants to the plaintiffs.

On a prior appeal, after oral argument, this court, sua sponte, dismissed the appeal on the ground that the court was without jurisdiction because the judgment order was not final and appealable under section 50(2) of chapter 110, Ill Rev Stats 1963. This court noted that if the court below, on application of the appellant, should see fit to enter an order that no just reason exists for delaying the appeal, and if the subject matter of the appeal were again presented to this court, we would transfer the abstracts and briefs then on file to the new file which would be opened for the new appeal.

The appellants obtained an order from the court below which stated that no just reason existed for delaying the appeal, and the defendants filed the instant appeal. We shall now consider the merits.

On August 14, 1962, a temporary injunction was issued against the defendants. The cause was referred to a master who held hearings and filed a report with the court. Objections to the report were filed and the master overruled them, and ordered that they stand as exceptions, which exceptions were overruled by the trial court.

Plaintiffs W. A. Bruce and L. H. Bruce (under the names of Oak Park Food Service and Freezo Center Corporation) were engaged in the business of selling home food freezers, memberships in frozen food purchase plans, and frozen foods to persons residing in the western and northwestern suburbs surrounding Chicago. The offices of plaintiffs are in a building in Oak Park, Illinois, which also houses a freezer area, meat-cutting shop, cooler and work area.

In January 1960, Leonard A. Ferrara, one of the defendants, was employed by plaintiffs as a salesman; he worked for them in that capacity for approximately a month, at which time he left their employ. In May 1960, Ferrara and the plaintiffs entered into a new arrangement, through which Ferrara was to be an independent contractor and dealer selling home freezers and frozen food purchase plans. The plaintiffs agreed that Ferrara could use the name "Oak Park Food Service" and also "Freezo Center" for which privilege Ferrara would pay certain fees to the plaintiffs. In accordance with their agreement Ferrara paid plaintiffs a fee of $55 on every freezer, and a fee of $65 on every food membership plan sold by his organization. Ferrara employed his own salesmen, bookkeepers, telephone solicitors, and had his own office space and telephones. In return for the fees paid by Ferrara the plaintiffs not only agreed to the use of their customer lists for soliciting business,

274

but they supplied Ferrara with certain office space on their premises, permitted the use of plaintiffs' financing source in connection with the sale of home freezers, and supplied certain other incidental services. When any of Ferrara's customers required financing for the purchase of a freezer and/or food membership plan, Ferrara guaranteed the payment of such purchase.

All sales made by Ferrara's organization after September 1960 were made under the names of United Division-Oak Park Food Service and United Division-Freezo Center. Commencing February 1, 1962, Ferrara terminated financing home freezers through plaintiffs and terminated the fee payment arrangement of $55 per freezer. Thereafter he paid the plaintiffs $140 per month for the rental of office space in plaintiffs' building. Ferrara obtained several additional telephone numbers and paid his own telephone bills. When he sold food memberships he sold them in Freezo Center, and the purchasers' names were added to the plaintiffs' customer list. Ferrara testified that after May 1960 he received $185 from Freezo for every food membership contract he sold; that he sold 500 contracts between June 1960 and June 1962, which would amount to $92,500 paid by Freezo to Ferrara for such sales.

On June 16, 1962, Ferrara moved his organization out of plaintiffs' premises to new quarters in River Forest, about a mile and a half from the office of plaintiffs. He then organized Mid-America Food Service, Inc., from which he began selling food freezers and frozen food purchase plans, and transferred his telephone service to the new address. Soon after organizing Mid-America Food Service, Ferrara mailed advertisements to customers, advising that the United Division-Oak Park Food Service had changed its name to Mid-America Food Service.

About two weeks after moving, Ferrara hired the defendant, Mary Eggert, as a telephone solicitor for Mid-

America Food Service. Prior to that time she had been employed by the plaintiffs as a telephone solicitor, in which capacity she had a working customer card file in her desk of about 900 cards containing information concerning customers. These names had been supplied by both Ferrara's organization and that of the plaintiffs. Ferrara, while employed by plaintiffs, had found new customers and maintained a duplicate of the list which his organization supplied.

Mary Eggert testified that while working for plaintiffs she kept a working card file of customers' names; that she received the names from plaintiffs and made cards on those from whom she received orders. She stated that she was responsible for 150 customers per month and was the customer contact.

The plaintiffs, doing business as Freezo Center, had been engaged since 1955 in the sale of frozen foods to the owners of home food freezers. They had acquired a list of customers, beginning with several thousand names which W. A. Bruce, as the distributor for the Rich Plan (a frozen food plan which had been discontinued), had purchased from Ranier Corp., for which list he paid $2,000. They had purchased another list from St. Charles Locker Company for $250, and another list of 2,000 customers from Carson Pirie Scott & Company. These lists had been developed over eleven years, since 1952. As Freezo Center, plaintiffs maintained a customer list which, at the time of the hearing, consisted of nine bound books, each labeled "Customers List." (This list was introduced in evidence as Plaintiffs' Exhibit 18.) Freezo Center also maintained a manila folder 8½″ x 11″ customer file, master customer card, and a working card for the telephone solicitor for reordering.

Mrs. L. H. Bruce testified that she also was employed in the office of plaintiffs and that she solicited customers on the telephone. She stated that Freezo had approximately 4,500 active customers immediately prior to June

29, 1962; that there was a customer working card for each of the active customers; that she had approximately 300 of such cards, and that "the remaining working cards were in possession of Mary."

W. A. Bruce, plaintiff, testified that Mary Eggert had a working card file; that after she left their employ they examined the working cards in her desk and found that approximately 900 of the cards were missing. He stated, "I believe Mary stole 900 cards because they were missing. I did not see her steal them and I know of no one who saw her steal them. Some of the names on the list included Ferrara's customers. Possibly ten, twenty percent of this list. . . . We noticed the cards were missing approximately a month or two after Mary left. If the cards were missing prior to her leaving we would not know."

W. A. Bruce further testified that after Mary Eggert became an employee of Mid-America Food Service she had contacted 90 percent of the customers on the list prepared by him (Plaintiffs' Exhibit 11), presumably of the 900 cards which he accused Mary Eggert of taking from the Freezo office. It may be noted that this testimony is not supported anywhere, and that Mary Eggert testified that she called only 112 names listed on Plaintiffs' Exhibit 11, and that she was the only one who made calls for Mid-America. She further testified that 84 of the 112 calls were made to customers of Ferrara's, and that 28 of them she made from her memory. She testified that there were 48 duplications on Plaintiffs' Exhibit 11.

Mary Eggert testified that there were always approximately 1,000 index cards in her desk drawer; that she did not make a list from these cards, nor did she make a record for her own use or for anyone's use; that she had never stolen any customer lists or index cards from Freezo Center. She testified that she did not attempt to memorize the names of customers on the cards of

Freezo but that she had the ability to recall the names of certain of the customers on the index cards.

Ferrara testified that he had never seen any customer lists owned by plaintiffs; had never taken any cards from plaintiffs; nor had Mary Eggert ever brought him any customer lists or cards.

The master found that a suit had been brought by plaintiffs against Ferrara and Eggert to enjoin them from "unfairly competing with plaintiffs in the business of selling home freezers and frozen foods, . . . ." The master also made a finding of fact that during the six years of her employment by plaintiffs, Eggert had used approximately 20,000 customer cards in her duties. "However, her active file consisted of about one thousand cards which she kept in her drawer. All of the names of customers were supplied to Mary by the plaintiffs."

The master also found, as a matter of fact, that "there is evidence in the record, although not conclusive, that 900 of Mary Eggert's 3″ x 5″ customer list cards customarily kept in her desk were missing subsequent to the date she quit her employment at plaintiffs." As a matter of fact, W. A. Bruce testified that it was two months after she had left their employ that he discovered some of the cards were missing. The master also found that a majority of these 900 customers were contacted by Eggert after she commenced working for Mid-America. On that subject W. A. Bruce's testimony was that he compiled a list which represented the names on the missing cards; that they prepared this list a month after Mary Eggert left because they were not receiving the "orders that we normally would get from customers." He continued his testimony, stating that they first "noticed the cards were missing approximately a month or two after Mary left. If the cards were missing prior to her leaving, we did not know."

The master's finding that there was evidence which was not conclusive, that Eggert took the cards,

goes much too far. To hold that Eggert took the cards, on the evidence in the record, is an unjustified inference and is answered by Eggert's testimony which flatly contradicted any such allegation. Mrs. Bruce testified that there were approximately 4,200 cards in Eggert's possession; that evidence is not substantiated. (It is worthy of note that Plaintiffs' Exhibit 18, which was admitted in evidence, includes the plaintiffs' customers from 1955 to 1962 and contains over 20,000 names.) On the other hand, Eggert testified that while she was working for plaintiffs she had approximately 1,000 index cards in her desk drawer and that there were eight or ten people in the employ of plaintiffs who had access to the index cards. After examining the list prepared by plaintiffs as Exhibit 11, Eggert testified that she had called only 112 names so listed; that 84 of the calls were to customers of Ferrara's; and that she made 28 calls from memory. The nine volumes of customer lists were received in evidence. The finding of the master that Mary Eggert took the 900 cards was against the manifest weight of the evidence.

We must bear in mind that in this case there was no restrictive covenant ancillary to employment between the plaintiffs and the defendants. In American Cleaners and Dyers v. Foreman, 252 Ill App 122, a decree was obtained in the trial court enjoining defendants from soliciting orders for cleaning and dyeing from certain listed customers of plaintiff's. The Appellate Court found that there was no express contract between the plaintiff and the defendants providing that defendants would not solicit any of their old customers, and determined that it was error to have issued the injunction. That case stated, however, that if the employee had surreptitiously copied the names and addresses of his employer's customers and fraudulently taken such list with him, he would be enjoined from soliciting such customers for his new employer. The court discussed and distinguished Boylston

Coal Co. v. Rautenbush, 237 Ill App 550, which held that while there was no contract between the employer and the employee, an injunction should properly be issued against the employee since there was sufficient evidence to prove that a list which had been in plaintiff's possession was surreptitiously taken by the departing employee. The Boylston court, however, pointed out that the list in question was of a peculiar character and quality, and employees entrusted with the information contained in the list could not be allowed to use that information to the detriment of the plaintiff employer. The court said: "A list of agents in the mail order coal business was in the nature of a trade or business secret; . . . ." (Page 558.)

In American Cleaners and Dyers v. Foreman, supra, the court pointed out the further distinction that in Boylston the evidence was sufficient to prove that the defendant had surreptitiously taken a printed list, and such list was in the nature of a trade secret. The court stated at page 134:

"Upon a consideration of the authorities we are of the opinion that the great weight of authority and the better reason supports the view that, in the absence of an express contract, equity will not enjoin a former employee from soliciting the employer's customers whom he served during his employment where, as here, no list of names was taken . . . and no fraud was committed by them. . . . the names and addresses of complainant's customers were not trade secrets within the meaning of the law. And as stated by the Supreme Court of Maryland, to enjoin them under the facts disclosed would tend to destroy their freedom 'and to reduce them to a condition of industrial servitude.' "

In a recent case, Mid-States Vending Service v. Rosen, 77 Ill App2d 83, 222 NE2d 99, a question arose similar

to that in the case before us. A temporary injunction had been issued restraining the defendant from soliciting business of customers of plaintiff who had been customers during the period of defendant's employment by plaintiff. There was no restraining restrictive contract. The defendant had left plaintiff's employ, where his duties primarily had been seeking out new customers and servicing complaints of current customers. He was employed there for approximately two months, was then employed by another company, and later became a free-lancer. The court cited and quoted with approval from American Cleaners and Dyers v. Foreman, 252 Ill App 122; also Professional Service Corp. v. Johnson, 316 Ill App 431, 45 NE2d 191, which latter case held that a defendant could solicit his former employer's customers even though he had been employed as manager of plaintiff's collection agency. The court held that there was no proof that defendant had taken the customer's list with him, but only showed that the defendant may have been familiar with those with whom he dealt while in plaintiff's employ. The court reversed the order granting a temporary injunction.

In the case before us there was no restrictive covenant. The evidence was insufficient to show that any list was surreptitiously taken by plaintiffs' employee. Ferrara started his own business on June 16, 1962, and two weeks later Eggert became his employee. The trial court entered a temporary injunction on August 14, 1962; on April 7, 1965, the trial court entered a permanent injunction by which the defendants were restrained from making use of plaintiffs' customer lists or soliciting plaintiffs' customers. The court indicated that the customer lists referred to were the nine volumes of names introduced in evidence as Plaintiffs' Exhibit 18 (20,000 names). In other words, the defendants were enjoined from soliciting any names appearing on that list, whether or not the names were known to Ferrara or Eggert.

■ The question as to the use of telephone numbers in Ferrara's new business, which numbers had formerly been used by him, has become moot, and there is not sufficient evidence in the record to prove that Ferrara unfairly sent out advertisements. Ferrara had been authorized by plaintiffs to solicit orders and to do business independently under the name of United Division-Oak Park Food Service. No restrictive contract was entered into between the parties at that time. Later, when Ferrara established his own business, the advertisements which he sent out were that "United Division-Oak Park Food Service" had changed its name to Mid-America Food Service, and had moved its place of business, giving the address. The evidence is not sufficient to show an unfair attempt on the part of Ferrara to take advantage of plaintiffs.

It is true that five checks were received at the office of Mid-America Food Service, which checks were intended for plaintiffs, but such limited incidents do not establish the necessity for an injunction, especially since the checks were immediately endorsed by Ferrara and sent to Freezo Center.

It would seem reasonable to assume that if Ferrara was soliciting independently under the name of United Division-Oak Park Food Service, he would be entitled to keep an independent list of the customers he had independently contacted and solicited, and that any use of that list would not be interfering with any right of plaintiffs.

■ The permanent injunction should not have been granted; it was far too broad, inasmuch as it includes all of the 20,000 names contained in Plaintiffs' Exhibit 18. Also, there is no showing that any former customer of plaintiffs, except one, placed any order with Ferrara. The testimony is that there was only one order placed by that customer. In its injunction the court ordered an accounting by Ferrara for any gain derived by him for

sales to any of plaintiffs' customers. As pointed out, there was only one order of one customer involved. Here we must apply the maxim, de minimis non curat lex. Mrs. Bruce testified that at the time Ferrara organized Mid-America Food Service, the plaintiffs had approximately 4,500 active customers. While it is true that Eggert had been working with the plaintiffs since 1956, there is nothing in the record to indicate that the 20,000 names in Plaintiffs' Exhibit 18 were active customers. The evidence in the record does not support the findings of the master, nor the final injunction order entered in the trial court.

The case is reversed and remanded with directions to the trial court to dismiss the complaint.

Reversed and remanded with directions.

DRUCKER, P. J. and ENGLISH, J., concur.